# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## NORTHEASTERN DIVISION

| | | |
|---|---|---|
| **AMY ELIZABETH PRESCOTT,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Civil Action No. 2:11-cv-00024** |
| **v.** | ) | **Judge Wiseman/ Knowles** |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | |
| **Commissioner of Social Security** | ) | |
| | ) | |
| **Defendant.** | ) | |

## REPORT AND RECOMMENDATION

This is a civil action filed pursuant to 42 U.S.C. § 405(g), to obtain judicial review of the final decision of the Commissioner of Social Security denying Plaintiff Disability Insurance Benefits ("DIB"), as provided under Title II of the Social Security Act ("the Act"). The case is currently pending on Plaintiff's Motion for Judgment on the Administrative Record. Docket No.15. Defendant has filed a Response, arguing that the decision of the Commissioner was supported by substantial evidence and should be affirmed. Docket No. 21.

For the reasons stated below, the undersigned recommends that Plaintiff's Motion for Judgement on the Administrative Record be DENIED, and that the decision of the Commissioner be AFFIRMED.

## I. INTRODUCTION

Plaintiff filed her application for Disability Insurance Benefits ("DIB") on June 16, 2005, alleging that she had been disabled since April 12, 2005, due to severe iron deficiency, anemia,

heart problems, tremors, blackouts/dizziness, fatigue and weakness. *See, e.g.,* Docket No. 12, Attachment ("TR"), pp. 17, 56, 84, 87. Plaintiff's application was denied both initially (TR 58) and upon reconsideration (TR 55). Plaintiff subsequently requested (TR 53) and received (TR 47) a hearing. Plaintiff's initial hearing was held on April 29, 2009, by Administrative Law Judge ("ALJ") Jack B. Williams. TR 476. Plaintiff and vocational expert ("VE"), Anne Thomas, appeared and testified. TR 476. After receiving additional evidence, Plaintiff requested and received (TR 29) a supplement hearing. Plaintiff's supplemental video hearing was conducted on November 10, 2009, by ALJ Jack B. Williams. TR 464. Plaintiff and VE Ernest Brewer, appeared and testified. TR 464.

On December 10, 2009, the ALJ issued a decision unfavorable to Plaintiff, finding that Plaintiff was not disabled within the meaning of the Social Security Act and Regulations. TR 14. Specifically, the ALJ made the following findings of fact:

1. The claimant last met the insured status requirements of the Social Security Act on September 30, 2008.

2. The claimant did not engage in substantial gainful activity during the period from her alleged onset date of April 12, 2005 Through her date last insured of September 30, 2008 (20 CFR 404.1571 *et seq.*).

3. Through the date last insured, the claimant has the following combination of severe impairments: iron deficiency, obesity, chronic fatigue syndrome, chronic tension headaches, dizziness, endometriosis status post hysterectomy, mixed connective tissue disease, and depression (20 CFR 404.1520(c)).

4. Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5.      After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except that she had mild to moderate emotional limitations; she must avoid work in which she has to relate closely as opposed to superficially with others; she must avoid complex work; and she can perform lower semi-skilled work but not highly skilled work where she has to concentrate and attend on a prolonged and intense basis.

6.      Through the date last insured, the claimant was capable of performing past relevant work as a cashier, teleservice processor, and fast food worker. This work did not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565).

7.      The claimant was not under a disability, as defined in the Social Security Act, at any time from April 12, 2005, the alleged onset date, through September 30, 2008, the date last insured (20 CFR 404.1520(f)).

TR 19-27.

On February 8, 2010, Plaintiff timely filed a request for review of the hearing decision.

TR 7. On January 12, 2011, the Appeals Council issued a letter declining to review the case (TR 3), thereby rendering the decision of the ALJ the final decision of the Commissioner. This civil action was thereafter timely filed, and the Court has jurisdiction. 42 U.S.C. § 405(g). If the Commissioner's findings are supported by substantial evidence, based upon the record as a whole, then these findings are conclusive. *Id.*

## II.  REVIEW OF THE RECORD

The parties and the ALJ have thoroughly summarized and discussed the medical and testimonial evidence of Record. Accordingly, the Court will discuss those matters only to the extent necessary to analyze the parties' arguments.

### III. CONCLUSIONS OF LAW

### A. Standard of Review

This Court's review of the Commissioner's decision is limited to the record made in the administrative hearing process. *Jones v. Secretary*, 945 F.2d 1365, 1369 (6th Cir. 1991). The purpose of this review is to determine (1) whether substantial evidence exists in the record to support the Commissioner's decision, and (2) whether any legal errors were committed in the process of reaching that decision. *Landsaw v. Secretary*, 803 F.2d 211, 213 (6th Cir. 1986).

"Substantial evidence" means "such relevant evidence as a reasonable mind would accept as adequate to support the conclusion." *Her v. Commissioner*, 203 F.3d 388, 389 (6th Cir. 1999) (*citing Richardson v. Perales*, 402 U.S. 389, 401 (1971)). "Substantial evidence" has been further quantified as "more than a mere scintilla of evidence, but less than a preponderance." *Bell v. Commissioner,* 105 F.3d 244, 245 (6th Cir. 1996) (*citing Consolidated Edison Co. v. N.L.R.B.,* 305 U.S. 197, 229, 59 S.Ct. 206, 216, 83 L.Ed. 126 (1938)).

The reviewing court does not substitute its findings of fact for those of the Commissioner if substantial evidence supports the Commissioner's findings and inferences. *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). In fact, even if the evidence could also support a different conclusion, the decision of the Administrative Law Judge must stand if substantial evidence supports the conclusion reached. *Her*, 203 F.3d at 389 (*citing Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997). However, if the Commissioner did not consider the record as a whole, the Commissioner's conclusion is undermined. *Hurst v. Secretary*, 753 F.2d 517, 519 (6th Cir. 1985) (*citing Allen v. Califano,* 613 F.2d 139, 145 (6th Cir. 1980) (*citing Futernick v. Richardson,* 484 F.2d 647 (6th Cir. 1973))).

In reviewing the decisions of the Commissioner, courts look to four types of evidence: (1) objective medical findings regarding Plaintiff's condition; (2) diagnosis and opinions of medical experts; (3) subjective evidence of Plaintiff's condition; and (4) Plaintiff's age, education, and work experience. *Miracle v. Celebrezze*, 351 F.2d 361, 374 (6th Cir. 1965).

### B.  Proceedings At The Administrative Level

The claimant carries the ultimate burden to establish an entitlement to benefits by proving his or her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).  "Substantial gainful activity" not only includes previous work performed by Plaintiff, but also, considering Plaintiff's age, education, and work experience, any other relevant work that exists in the national economy in significant numbers regardless of whether such work exists in the immediate area in which Plaintiff lives, or whether a specific job vacancy exists, or whether Plaintiff would be hired if he or she applied.  42 U.S.C. § 423(d)(2)(A).

At the administrative level of review, the claimant's case is considered under a five-step sequential evaluation process as follows:

>(1)  If the claimant is working and the work constitutes substantial gainful activity, benefits are automatically denied.

>(2)  If the claimant is not found to have an impairment which significantly limits his or her ability to work (a "severe" impairment), then he or she is not disabled.

>(3)  If the claimant is not working and has a severe impairment, it must be determined whether he or she suffers from one of the

"listed" impairments[1] or its equivalent.  If a listing is met or
equaled, benefits are owing without further inquiry.

(4)  If the claimant does not suffer from any listing-level
impairments, it must be determined whether the claimant can
return to the job he or she previously held in light of his or her
residual functional capacity (e.g., what the claimant can still do
despite his or her limitations).  By showing a medical condition
that prevents him or her from returning to such past relevant work,
the claimant establishes a *prima facie* case of disability.

(5)  Once the claimant establishes a *prima facie* case of disability,
the burden shifts to the Commissioner to establish the claimant's
ability to work by proving the existence of a significant number of
jobs in the national economy which the claimant could perform,
given his or her age, experience, education, and residual functional
capacity.

20 C.F.R. §§ 404.1520, 416.920 (footnote added).  *See also Moon v. Sullivan*, 923 F.2d 1175,

1181 (6th Cir. 1990).

The Commissioner's burden at the fifth step of the evaluation process can be satisfied by

relying on the medical-vocational guidelines, otherwise known as "the grid," but only if the

claimant is not significantly limited by a nonexertional impairment, and then only when the

claimant's characteristics identically match the characteristics of the applicable grid rule.

Otherwise, the grid cannot be used to direct a conclusion, but only as a guide to the disability

determination.  *Id.*  In such cases where the grid does not direct a conclusion as to the claimant's

disability, the Commissioner must rebut the claimant's *prima facie* case by coming forward with

particularized proof of the claimant's individual vocational qualifications to perform specific

jobs, which is typically obtained through vocational expert testimony.  *See Varley v. Secretary*,

820 F.2d 777, 779 (6th Cir. 1987).

---

[1]The Listing of Impairments is found at 20 C.F.R., Pt. 404, Subpt. P, App. 1.

In determining residual functional capacity for purposes of the analysis required at stages four and five above, the Commissioner is required to consider the combined effect of all the claimant's impairments; mental and physical, exertional and nonexertional, severe and nonsevere. *See* 42 U.S.C. § 423(d)(2)(B).

### C. Plaintiff's Statement Of Errors

Plaintiff contends that the ALJ erred in: 1) improperly weighing the opinion evidence of record; 2) finding that Plaintiff retained the residual functional capacity to perform light work with some noted exceptions; and 3) finding that Plaintiff failed to meet the requirements of Listing 14.06.[2]  Docket No. 16.  Accordingly, Plaintiff maintains that, pursuant to 42 U.S.C. § 405(g), the Commissioner's decision should be reversed, or in the alternative, remanded.  *Id.*

Sentence four of § 405(g) states as follows:

> The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing.

42 U.S.C. §§ 405(g), 1383(c)(3).

"In cases where there is an adequate record, the Secretary's decision denying benefits can be reversed and benefits awarded if the decision is clearly erroneous, proof of disability is overwhelming, or proof of disability is strong and evidence to the contrary is lacking." *Mowery v. Heckler*, 771 F.2d 966, 973 (6th Cir. 1985).  Furthermore, a court can reverse the decision and

---

[2]Plaintiff titles one of her arguments as "Claimant's Credibility Supported by Objective & Subjective Testing." Docket No. 16.  While this title suggests that Plaintiff is arguing that the ALJ erred in his assessment of her credibility, the corresponding explanation refers to the weight accorded to the opinion of the consultative examiners.  *Id.*  The undersigned will address the substance of Plaintiff's argument, irrespective of the title.

immediately award benefits if all essential factual issues have been resolved and the record adequately establishes a plaintiff's entitlement to benefits. *Faucher v. Secretary*, 17 F.3d 171, 176 (6ᵗʰ Cir. 1994). *See also Newkirk v. Shalala*, 25 F.3d 316, 318 (1994).

## 1. Weight Accorded to Medical Opinions

Plaintiff maintains that the ALJ did not appropriately weigh several medical opinions in the record. Docket No. 16. Specifically, Plaintiff argues that Dr. Donita Keown's opinion should be "disregarded" because Dr. Keown: (1) examined Plaintiff on only one occasion; (2) "is a psychiatrist primarily, but yet she performed the physical evaluation portion of the exams"; (3) did not adequately examine Plaintiff's background medical evidence; (4) did not reference any of Plaintiff's medical records, specialist referrals, or lab work; and (5) expressly erred in stating that Plaintiff did not have a diagnosed cardiac condition, when the record clearly indicates otherwise. *Id.* Plaintiff also contends that the ALJ improperly failed to accept the opinions of consultative examiner Dr. Michael Cox and her six other treating specialists, without explanation. *Id.* Plaintiff contends that the opinions of specialists Drs. Jim Gore and Daniel Donovan, in particular, should have been accepted, and that the opinion of treating physician Dr. D.N. Joshi should have been accorded controlling weight.[3] *Id.*

Defendant responds that the ALJ accorded proper weight to the opinions of record. Docket No. 21. Specifically, Defendant stresses the validity of Dr. Keown's opinion and the weight accorded thereto. *Id.* Defendant further maintains that the ALJ accorded proper weight

---

[3]The undersigned notes that Plaintiff refers to Dr. *David* Donovan. Docket No. 16. The record, however, reflects that Dr. *Daniel* Donovan examined Plaintiff. *See* TR 227. The undersigned will reference Dr. Donovan's findings as they appear in the record. This discrepancy is not material to the issues before the Court.

to Dr. Cox's findings in determining that Plaintiff's limitations were not as severe as Dr. Cox opined. *Id.* Defendant additionally argues that Dr. Joshi's opinion was properly discredited because it was untimely, conclusory, and largely based on Plaintiff's non-credible self-report. *Id.*[4]

With regard to the evaluation of medical evidence, the Code of Federal Regulations states:

> Regardless of its source, we will evaluate every medical opinion we receive. Unless we give a treating source's opinion controlling weight under paragraph (d)(2) of this section, we consider all of the following factors in deciding the weight we give to any medical opinion.
>
> (1) Examining relationship. Generally, we give more weight to the opinion of a source who has examined you than to the opinion of a source who has not examined you.
>
> (2) Treatment relationship. Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques *and is not inconsistent with the other substantial evidence in your case record*, we will give it controlling weight. When we do not give the treating source's opinion controlling weight, we apply the factors listed in paragraphs (d)(2)(i) and (d)(2)(ii) of this section, as well as the factors in paragraphs (d)(3) through (d)(6) of this section in determining the weight to give the opinion. ...
>
> (3) Supportability. The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion.

_____

[4]Defendant did not specifically respond to Plaintiff's contentions regarding the ALJ's failure to accept the opinions of her six other treating specialists, including Drs. Gore and Donovan. This point, however, will be discussed in greater detail below.

> The better an explanation a source provides for an opinion, the more weight we will give that opinion. ...
>
> (4) Consistency. Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion.
>
> (5) Specialization. We generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist. ...

20 C.F.R. § 416.927(d) (emphasis added). *See also* 20 C.F.R. § 404.1527(d).

If the ALJ rejects the opinion of a treating source, he is required to articulate some basis for rejecting the opinion. *Shelman v. Heckler*, 821 F.2d 316, 321 (6th Cir. 1987). The Code of Federal Regulations defines a "treating source" as:

> [Y]our own physician, psychologist, or other acceptable medical source who provides you or has provided you, with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with you.

20 C.F.R. § 404.1502.

As has been noted, Plaintiff contends that Dr. Keown's opinion should be "disregarded" because Dr. Keown: (1) examined Plaintiff on only one occasion; (2) "is a psychiatrist primarily, but yet she performed the physical evaluation portion of the exams"; (3) did not adequately examine Plaintiff's background medical evidence; (4) did not reference any of Plaintiff's medical records, specialist referrals, or lab work; and (5) expressly erred in stating that Plaintiff did not have a diagnosed cardiac condition, when the record clearly indicates otherwise. Docket No. 16.

The ALJ discussed Dr. Keown's findings as follows:

> The claimant was consultatively examined in June 2009 by Donita Keown, M.D. The physician examiner noted that the claimants [*sic*] last "blackout spell" was three or four weeks prior to the

10

examination. The physician examiner noted that the claimant does not have a history of seizure disorder, that *she did not give a history* of arrhythmia or chest pain, and she has not had a CT scan or neuro-imaging test despite alleging a history of syncope dating back more than 15 years. The physician examiner diagnosed the claimant with obesity and multijoint arthralgia and what sounds like a tentative diagnosis of mixed connective tissue disease with no objective evidence of inflammatory arthritis. The physician examiner opined that the claimant can sit, stand, walk, lift, and carry without restrictions. In a medical source statement of ability to do work-related activities (physical) the physician examiner noted that there is "no evidence of impairment". She opined that the claimant can sit, stand, and walk for 8 hours in an 8 hour workday. [She] noted that the claimant's subjective complaints are not supported by objective data and the physical exam did not produce evidence to support her claims.

TR 24 (emphasis added).

As an initial matter, the fact that Dr. Keown examined Plaintiff on only one occasion as a consultative examiner does not mean that her opinion should be "disregarded." The Regulations provide that every medical opinion will be evaluated, and that appropriate weight should be accorded to the medical opinions of record (including those of consultative examiners) based upon the factors quoted above. *See* 20 C.F.R. § 416.927(d); 20 C.F.R. § 404.1527(d). Secondly, Dr. Keown's specialty is, in fact, general medicine. *See* TR 209. It is therefore within her expertise to perform a physical evaluation.

With regard to Plaintiff's arguments that Dr. Keown did not adequately examine her background medical evidence and made no reference to her medical records, specialist referrals, or lab work, Dr. Keown outlined Plaintiff's medical history at the outset of her report. *See* TR 201-03. While Plaintiff is correct in her assertion that Dr. Keown stated that she did "not have a diagnosed cardiac condition," Dr. Keown continued, "[Plaintiff] was told that at one time she may have a prolapsed tricuspid valve." TR 201. Dr. Keown's notation indicates that she was

aware of Plaintiff's cardiac history. Upon examination, Dr. Keown determined that Plaintiff's

heart was functioning normally. TR 202. This determination is consistent with the evidence

from Plaintiff's cardiologist, Dr. Dilworth, which the ALJ discussed as follows:

> A March 2005 echocardiogram was normal except for mild mitral
> valve prolapse, mild to moderate tricuspid insufficiency, and trace
> circumferential pericardial effusion. A November 2005 treatment
> record indicated that the claimant has had a good response to
> parenteral iron administration. A February 2006 treatment record
> indicated that the claimant denied significant chest pain and
> shortness of breath though she did have occasional chest pressure
> and panic attacks. A treadmill stress test was administered and
> revealed good exercise tolerance with excellent cardiac stress,
> pronounced sinus tachycardia at low levels of exertion, and
> negative stress EKG for ischemia. An April 2006 echocardiogram
> which was "essentially unchanged" from 2005 [*sic*].

TR 22-23, *citing* TR 363-73.

Dr. Keown's opinion is consistent with the above, as well as with other treating and

examining physicians reports that Plaintiff's heart condition was normal. *See, e.g.,* TR 282-89,

300, 343. Contrary to Plaintiff's assertion, there is no reason to "disregard" Dr. Keown's

opinion. The ALJ's accordation of weight to Dr. Keown's opinion was proper.

With regard to Plaintiff's contention that the ALJ improperly failed to accept the

opinions of consultative examiner Dr. Cox and her six other treating specialists without

explanation, as will be demonstrated below, the ALJ considered their opinions, but did not give

controlling weight to any one medical source. *See* TR 19-27.

Recounting Plaintiff's medical records from Family Care Specialists, Knoxville Heart

Group, Premier Surgical Associates, and Sleep Disorders Center, the ALJ stated:

> Medical records show that the claimant has been diagnosed with
> obesity and other hyperailment. The claimant has been
> treated for menorrhagia with severe iron deficiency anemia. She

12

had severe anemia with severe iron depletion following gastric bypass surgery in 2000 when she was unable to absorb iron in an efficient manner. A March 2004 treatment record indicated that the claimant has a medical history that includes chronic fatigue syndrome, edema, tension headaches, hypercholesterolemia, hypertension, malaise, fatigue, dizziness, pneumonia, and sleep apnea. An October 2004 colonoscopy was normal. A November 2004 treatment record noted that the claimant's sleep onset insomnia was significantly improved. In November 2004, the claimant underwent a hysteroscopic endometrial ablation. In April 2005, the claimant underwent a total abdominal hysterectomy and bilateral salpingo-oophorectomy. She has been treated for a ventral incisional hernia. In March 2005, the claimant "blacked out" while driving and hit a bridge. An electroencephalogram test was within the range of normal during wakefulness and intermittent light sleep. A March 2005 echocardiogram was normal except for a mild mitral valve prolapse, mild to moderate tricuspid insufficiency, and trace circumferential pericardial effusion. A November 2005 treatment record indicated that the claimant has had a good response to parenteral iron administration. A February 2006 treatment record indicated that the claimant denied significant chest pain and shortness of breath though she did have occasional chest pressure and panic attacks. A treadmill stress test was administered and revealed good exercise tolerance with excellent cardiac stress, pronounced sinus tachycardia at low levels of exertion, and negative stress EKG for ischemia. An April 2006 echocardiogram which was "essentially unchanged" from 2005 [*sic*]. She was scheduled to come in after one year for a follow up echocardiogram. An April 2006 treatment record indicated that the claimant "has responded well to Venoder treatments" relating to her iron deficiency anemia. It also noted that the claimant's symptoms of dizziness, seeing white spots like shooting starts, unsteadiness on her feet, and hot flashes "may or may not be related to postmenopausal status". It also noted that "she does feel better since her blood counts had improved on the iron". In July 2008, the claimant began to complain about a new range of symptoms. She reported that she has diffuse, achy pain in her muscles, worse after exercise and with paplation, better with massage and rest. She also complained of achy pain in her hands with associated swelling and stiffness after activity, usually nonradiating, but moderate. She reported that she noticed significant weakness in her hands over the last several months. A November 2008 treatment record indicated that the claimant complained of numbness/tingling in her hands and pain radiating

from her elbows.  She reported weakness of her hands at times due to pain and cramping.  She reported severe low back pain usually nonradiating.

TR 22-23.

Recounting Plaintiff's treatment at the Knoxville Cancer Center and the Vanderbilt Medical Group, the ALJ stated:

> The claimant's treating physician Hesamm Gharavi, M.D., provided a letter dated July 2005 in which he reported that the claimant is now incapable of oral absorption of iron.  He went on to say "she has experienced significant symptomology including near syncope, fatigue, malaise, and inability to perform any activities that require performing strenuous physical actions as well as sustained mental activities.  She will very likely require intermittent intravenous repletion of iron stores, potentially for the rest of her life, to try to control some of these symptoms."  The claimant's treating physician Jim Gore, M.D. provided a letter dated August 2008 in which he reported that the claimant has a history of a positive antinuclear antibody test as well as myalgias, arthralgias, and fatigue.  She also has a history of a positive hypercoaguable test, B2GP1, which may be contributing to her symptoms, although that will have to be rechecked at a later date to confirm.  She does not have lupus, however, she appears to have undifferentiated connective tissue disease based on her symptoms and positive antinuclear antibody.  He noted that he started her on plaquenil, which he hoped will help her symptoms of muscle and joint pain as well as fatigue.  He finally noted that she cannot perform many of her normal activities.

TR 23.

As can be seen, the ALJ in the case at bar carefully considered Plaintiff's treatment with specialists at Family Care Specialists, Knoxville Heart Group, Premier Surgical Associates, Sleep Disorders Center, Knoxville Cancer Center, Vanderbilt Medical Group, and VMG Franking Rheumatology. TR 22-26, *citing* TR 201-18, 233-71, 282-89, 298-303, 319-414, 445.

Additionally, the ALJ's analysis specifically includes findings from Dr. Cox:

The claimant was consultatively examined in September 2006 by Michael Cox, M.D. The claimant had normal ranges of motion in her joints. Straight leg raising test was negative both in a lying and sitting position. He diagnosed the claimant with iron deficiency anemia status post Roux-en-Y anastomosis for obesity, history of morbid obesity now largely corrected with her weight down to 291 pounds, endometriosis status post hysterectomy, and atypical episodes of blackout, which may actually represent some sort of a kinetic seizure disorder versus a psychiatric illness. The physician examiner opined that the claimant could lift up to 10 pounds frequently and 20 pounds occasionally, she can sit for 8 hours in an 8 hour workday, she can stand six hours in an 8 hour workday with a break period every hour or so, her ability to hear, speak, and communicate is unimpaired, she should not work around heights or dangerous machinery, she will be unable to bend, stoop, squat, or kneel at all during an 8 hour workday, she will have significant difficulties with any sort of movement as it will produce vertigo.

TR 24, *citing* TR 298-303.

The above evidence demonstrates that the ALJ considered the treatment notes, examinations, and opinions of Plaintiff's specialists, as well as those of Dr. Cox.

With regard to the weight accorded to the opinion evidence, the ALJ stated:

The undersigned notes that the opinion of a treating physician must ordinarily be given substantial or considerable weight unless good cause is shown to the contrary. A treating physician's medical opinion on the issue of the nature and severity of an impairment is entitled to controlling weight. (SSR 96-2p). On the other hand, statements that a claimant is "disabled," "unable to work," can or cannot perform a past mob, meets a Listing or the like are not medical opinions but are administrative findings dispositive of a case, which require familiarity with the Regulations and legal standards set forth therein. Such issues are reserved to the Commissioner, who cannot abdicate his statutory responsibility to determine the ultimate issue of disability. Opinions on issues reserved to the Commissioner can never be entitled to controlling weight, but must be carefully considered to determine the extent to which they are supported by the record as a whole or contradicted by persuasive evidence. (20 CFR 404.1527(d)(2) and 416.927(d)(2); SSR 96-5p).

. . .

15

Great weight is given to the opinions of the State agency physical and psychological consultants and the psychological evaluator who provided assessments and reviews as they are consistent with the overall evidence of record. The State agency consultants and the psychological evaluator adequately considered the combined effect of the claimant's impairments. To the extent that they support the finding herein, the opinions of the physician examiners are given greater weight. The claimant's treating physicians' opinions are given little weight *to the extent that* they conclude that the claimant had greater limitation in work-related physical functioning than indicated by the State agency consultants, the psychological evaluator, and the physician examiners.

In sum, the above residual functional capacity assessment is supported by the fact that *the claimant does have iron deficiency, obesity, chronic fatigue syndrome, chronic tension headaches, dizziness, endometriosis status post hysterectomy, mixed connective tissue disease, and depression as confirmed by her treating physicians*, the consultative psychological evaluator, and the physician examiners, but retains the ability to perform light work except for the limitations set forth above.

TR 23-24, 26 (emphasis added).

The ALJ's decision demonstrates that, contrary to Plaintiff's assertion, the ALJ accepted the findings of Plaintiff's treating physicians that were consistent with, and supported by, the evidence of record, and accorded little weight to the parts of the treating physician opinions that placed greater limitations in work-related physical functioning on Plaintiff than the ALJ ultimately determined based on the evidence of record as a whole. This is within the ALJ's province. The ALJ recounted the evidence of record in great detail and reached a reasoned decision that was supported by substantial evidence. Plaintiff's argument on this point fails.

Plaintiff further contends that the ALJ should have accepted particularly the opinions of specialists Drs. Jim Gore and Daniel Donovan, and should have accorded controlling weight to the opinion of treating physician Dr. D.N. Joshi. Dr. Gore's findings, as discussed by the ALJ,

have been recounted, *supra*, and will not be repeated here.

On August 14, 2009, at the referral of Dr. Gore, Dr. Donovan completed a consultative neurological assessment of Plaintiff. TR 224-27. In that assessment, Dr. Donovan described the results of Plaintiff's cranial nerve examination as "unremarkable," and observed that Plaintiff was alert and anxious, with no evidence of hallucinosis or psychosis. TR 226. Dr. Donovan found that Plaintiff successfully performed a straight leg raising test to 90 degrees, and his motor examination revealed that Plaintiff's strength and fine motor movement were adequate. *Id.* Ultimately, Dr. Donovan concluded that Plaintiff's myriad of neurological complaints, despite their severity, "do not appear, thus far, to have a unifying relationship." TR 226-27. While Dr. Donovan posits possible medical sources of Plaintiff's complaints, he does not provide a diagnosis. *Id.* The ALJ considered Dr. Donovan's assessment and explained, "The overall record fails to show any evidence of significant functional deficits due to a mental disorder." TR 25.

Dr. Joshi is Plaintiff's primary care physician and the referring physician to Drs. Gore and Donovan, and as such he has been kept abreast of his colleagues' treatment notes and findings regarding Plaintiff's condition. *See, e.g.*, TR 227, 259. On November 9, 2009, Dr. Joshi conducted his own medical assessment of Plaintiff in which he opined that Plaintiff's impairments affected her lifting/carrying, standing/walking, and sitting. TR 453-455. In that assessment, he noted:

> [Plaintiff] has constant pain in all [joints]. She has connective tissue disorder and [positive antinuclear antibody]. [Patient] also has fibromyalga.

TR 453. As the referring physician, Dr. Joshi was privy to Dr. Gore's treatment notes (TR 259),

and his opinion reiterates Dr. Gore's findings without introducing new diagnoses. *Compare* TR 453 *with* TR 258-271. Dr. Donovan likewise shared his examination findings with Dr. Joshi, but Dr. Donovan's findings do not reflect the limitations that Dr. Joshi ultimately described. *Compare* TR 453 *with* TR 226-27. Notably, Dr. Joshi's examination does not include objective test results to substantiate his explanation of Plaintiff's limitations and medical conditions. TR 453-55. Since Dr. Joshi relied on Dr. Gore's findings in assessing Plaintiff's limitations, it is sufficient that the ALJ adequately discussed Dr. Gore's findings, as explained above. *See* TR 23.

On January 3, 2008, Dr. Tokaruk consultatively examined Plaintiff. TR 272-73. During this examination, Dr. Tokaruk noted Plaintiff's obesity, ordered blood tests, and prescribed her Vitamin D units. TR 273. Despite Plaintiff's assertion that "Dr. Tokaruk determined that she was profoundly vitamin D deficient" (Docket No. 16), in fact, Dr. Tokaruk simply stated, "*Odds are, she will be* profoundly Vitamin D deficient" (TR 273, emphasis added). Beyond this "[o]dds are" future prediction, the record does not include a diagnosis from Dr. Tokaruk regarding Plaintiff's Vitamin D levels.

As can be seen, the ALJ discussed the evidence of record in great detail. After throughly recounting the objective, testimonial, and opinion evidence, the ALJ accorded great weight to the opinions that he felt were consistent with the overall evidence of record. *See* TR 26. As the Regulations state, the ALJ is not required to give controlling weight to a treating physician's opinion when that opinion is inconsistent with, or unsupported by, substantial evidence in the record. *See* 20 C.F.R. § 416.927(d)(2) and 20 C.F.R. § 404.1527(d)(2). Instead, when there is contradictory evidence, the opinions are weighed against the contradictory evidence under the

criteria listed above. *Id.* When the opinions of physicians are inconsistent with each other, the final decision regarding the weight to be given to the differing opinions lies with the Commissioner. 20 C.F.R. § 416.927(e)(2). As such, the Regulations do not mandate that the ALJ accord any individual physician's opinion, much less the opinions of Drs. Gore, Donovan, or Joshi, controlling weight.

Because the ALJ properly analyzed the various opinions of record and accorded them weight based on the criteria set forth in the Regulations, the ALJ's decision must stand.

## 2. Residual Functional Capacity

Plaintiff also argues that the ALJ failed to explain his criteria and basis for determining that she retained the residual functional capacity to "perform light work, except that she has mild to moderate emotional restrictions; she must avoid work in which she has to relate closely as opposed to superficially with others; she must avoid complex work; and she can perform lower semi-skilled work but not highly skilled work where she has to concentrate and attend on a prolonged and intense basis." Docket No. 16. Plaintiff argues that the ALJ improperly relied "primarily" on her mental impairments to make this determination, and that Dr. Cox's findings preclude her from doing even sedentary work. *Id.* She further contends that the ALJ improperly derived this residual functional capacity determination from Listing 12.04 although Plaintiff did not claim that she met the requirements of that Listing.[5] *Id.*

Defendant responds that substantial evidence supports the ALJ's residual functional capacity determination. Docket No. 21. Specifically, Defendant cites Dr. Keown's assessment

_____

[5]As will be discussed in greater detail below, Plaintiff does, however, contend that she meets or medically equals Listing 14.06.

that Plaintiff has "no evidence of impairment." *Id.* Defendant also maintains that the ALJ's residual functional capacity determination is consistent with the opinion of Dr. Cox to the extent that his opinion is credible. *Id.* Defendant additionally argues that, in response to one hypothetical question that was based on Plaintiff's RFC and one hypothetical question that was even more restrictive, the VE testified that Plaintiff could return to her past relevant work as a cashier, credit card solicitor, fast food worker, and bookkeeper. *Id.* Defendant notes that the VE further identified sedentary jobs that the hypothetical claimant could perform, and argues in the alternative that Plaintiff retains at least the residual functional capacity to do sedentary work, which would likewise make her ineligible for disability benefits. *Id.*

"Residual Functional Capacity" is defined as the "maximum degree to which the individual retains the capacity for sustained performance of the physical-mental requirements of jobs." 20 C.F.R. Pt. 404, Subpt. P, App. 2 § 200.00(c). With regard to the evaluation of physical abilities in determining a claimant's Residual Functional Capacity, the Regulations state:

> When we assess your physical abilities, we first assess the nature and extent of your physical limitations and then determine your residual functional capacity for work activity on a regular and continuing basis. A limited ability to perform certain physical demands of work activity, such as sitting, standing, walking, lifting, carrying, pushing, pulling, or other physical functions (including manipulative or postural functions, such as reaching, handling, stooping or crouching), may reduce your ability to do past work and other work.

20 C.F.R. § 404.1545(b).

As the above indicates, Plaintiff is correct that physical limitations are a necessary consideration when determining her residual functional capacity. Plaintiff does not, however, show that the ALJ excluded considerations of her physical limitations when making his

determination. To the contrary, the ALJ decision's extensively references Plaintiff's physical impairments, examinations, and treatments as part of his residual functional capacity analysis. TR 21-26. The ALJ's analysis of Plaintiff's impairments, examinations, and treatments was discussed at length, *supra*, and will not be repeated here.

As pertains to his residual functional capacity determination specifically, the ALJ explained:

> The residual functional capacity outlined above is consistent with the medical evidence of record and with the claimant's hearing testimony. The medical evidence of record establishes that the claimant has a history of iron deficiency, obesity, chronic fatigue syndrome, chronic tension headaches, dizziness, endometriosis status post hysterectomy, mixed connective tissue disease, and depression.

TR 21.

The above quotation indicates that the ALJ acknowledged Plaintiff's extensive medical impairments and incorporated those medical findings into his residual functional capacity determination. As previously explained, the ALJ's opinion also contains great detail regarding Plaintiff's treatment with Family Care Specialists, Knoxville Heart Group, Premier Surgical Associates, Sleep Disorders Center, Knoxville Cancer Center, Vanderbilt Medical Group, VMG Franking Rheumatology, and various treating and consulting physicians. TR 22-26, *citing* TR 201-18, 233-71, 282-89, 298-303, 319-414, 445. Moreover, the ALJ articulated that he specifically considered "the impact obesity has on limitation of function including the claimant's ability to perform routine movement and necessary physical activity within the work environment." TR 21. The ALJ properly evaluated the medical evidence regarding Plaintiff's

physical limitations in reaching his residual functional capacity determination, and the Regulations do not require more.

With respect to Plaintiff's argument that Dr. Cox's findings preclude her from performing sedentary work, the Sixth Circuit has repeatedly held that sedentary work requires the ability to sit for extended periods and is precluded by an impairment which requires a claimant to alternate sitting and standing. *Preston v. Secretary*, 854 F.2d 815, 819 (6th Cir. 1988); *Howse v. Heckler*, 782 F.2d 626, 628 (6th Cir. 1986); *Wages v. Secretary*, 755 F.2d 495, 498 (6th Cir. 1985). The ALJ's discussion of Dr. Cox's findings was previously recounted, *supra*, and will not be fully repeated here. It is notable, however, that Dr. Cox found that Plaintiff "can sit for 8 hours in an 8 hour workday, she can stand six hours in an 8 hour workday with a break period every hour or so" (TR 24, *citing* TR 298-303). Despite the opinion that Plaintiff would require a break period, these limitations do not require Plaintiff to alternate sitting and standing, and they show that Dr. Cox opined Plaintiff was fully capable of sitting for extended periods of time as sedentary work demands. Thus, Plaintiff's contention that Dr. Cox's opinion precludes her from doing sedentary work fails. Moreover, as explained above, the ALJ properly considered Dr. Cox opinion.

Finally, while Plaintiff is correct that the ALJ proceeded with his step three analysis under Listing 12.04, Plaintiff is incorrect that the ALJ relied on the requirements of Listing 12.04 to make his residual functional analysis assessment. TR 20-26. As described above, the ALJ must follow a five-step evaluation process to determine if Plaintiff is entitled to disability benefits. 20 C.F.R. §§ 404.1520, 416.920. At step three of this process, the ALJ must determine if a claimant meets or medically equals a particular listing, and this is not dependent upon the

listings that a claimant may or may not cite in particular. *Id.* Upon determining that a claimant does not meet or medically equal a listed impairment, the ALJ then engages in the residual functional capacity inquiry. *Id.* Thus, it was proper for the ALJ to analyze whether Plaintiff meet the Listing 12.04 criteria during step three of his evaluation. The ALJ determined:

> With respect to the claimant's alleged physical impairments, the claimant does not have the gravity of symptoms nor medical documentation in order to establish an impairment of listing level severity.
>
> The claimant's mental impairments, considered singly and in combination, do not meet or medically equal the criteria of listing 12.04. ...

TR 20.

Given the ALJ's determination above, the ALJ properly proceeded through the steps in the sequential disability analysis. As previously explained, the ALJ detailed the appropriate criteria and basis for his residual functional capacity determination upon finding that Plaintiff did not meet or equal a listed impairment, and his analysis was well beyond the scope of Listing 12.04. TR 21-26.

For the reasons detailed above, Plaintiff's argument that the ALJ improperly determined her residual functional capacity must fail.

### 3. Meeting or Equaling Listing 14.06

Plaintiff additionally argues that "the ALJ failed to explain or even address" her claim that she met or medically equaled Listing 14.06. Docket No. 16. Specifically, Plaintiff asserts that her undifferentiated connective tissue disorder with positive ANA, severe joint pain,

malaise, and stiffness are sufficient to meet or equal the listing requirements. *Id.* As support for her contention, Plaintiff claims that at least six medical specialists have addressed her symptoms. *Id.* She cites in particular her diagnoses and treatment by Drs. Gharavi, Dilworth, Hulse, Tokaruk, Gore, and Donovan. *Id.*

Defendant responds that Plaintiff does not satisfy the requirements of Listing 14.06. Docket No. 21. Specifically, Defendant argues that Plaintiff's impairments are not sufficiently severe because they do not prevent her from performing *any* gainful activity. *Id., citing* 20 C.F.R. § 404.1525(a) (emphasis in original). Defendant contends that the consultative examinations by Drs. Keown and Cox indicate that Plaintiff could perform some gainful activity. *Id.* Defendant also contends that Plaintiff's testimony further demonstrates that she does not meet the Listing requirements. *Id.*

As a preliminary matter, the purpose of the Listings in determining disability is outlined in the Code of Federal Regulations: "It describes for each of the major body systems impairments that we consider to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education or work experience." 20 C.F.R. § 404.1525(a).

With regard to Listing 14.00 "Immune System Disorders" and Listing 14.06 "Undifferentiated and Mixed Connective Tissue Disease," the Code of Federal Regulations states:

> 14.00D5 *Immune System Disorders*
>
> a. *General*. This listing includes syndromes with clinical and immunologic features of several autoimmune disorders, but which do not satisfy the criteria for any of the specific disorders

24

described. . . .

b. *Documentation of undifferentiated and mixed connective tissue disease.* Undifferentiated connective tissue disease is diagnosed when clinical features and serologic (blood test) findings, such as rheumatoid factor or antinuclear antibody ["ANA"] (consistent with an autoimmune disorder) are present but do not satisfy the criteria for a specific disease. Mixed connective tissue disease (MCTD) is diagnosed when clinical features and serological findings of two or more autoimmune diseases overlap.

. . .

14.06 *Undifferentiated and mixed connective tissue disease.* As described in 14.00D5. With:

A. Involvement of two or more organs/body systems, with:

1. One of the organs/body systems involved to at least a moderate level of severity; and

2. At least two of the constitutional symptoms or signs (severe fatigue, fever, malaise, or involuntary weight loss).

or

B. Repeated manifestation of undifferentiated or mixed connective tissue disease, with at least two of the constitutional symptoms or signs (severe fatigue, fever, malaise, or involuntary weight loss) and one of the following at a marked level:

1. Limitation of activities of daily living.

2. Limitation in maintaining social functioning.

3. Limitation in completing tasks in a timely manner due to deficiencies in concentration, persistence, or pace.

20 C.F.R. Pt. 404, Subpt. P, App. 1, 14.00D5 and 14.06.

Plaintiff correctly asserts that the ALJ must evaluate the combined effect of her impairments. 42 U.S.C. § 423(d)(2)(B). Plaintiff, however, fails to show that the ALJ did not do so. Instead, Plaintiff simply maintains that the ALJ did not address, or only cursorily addressed,

her combined symptoms.  Docket No. 16.

Plaintiff accurately notes that she has several concurrent aliments, which the ALJ recognized: "the claimant had the following combination of severe impairments: iron deficiency, obesity, chronic fatigue syndrome, chronic tension headaches, dizziness, endometriosis status post hysterectomy, mixed connective tissue disease, and depression."  TR 22.  As described in detail above, however, the ALJ properly analyzed and weighed the medical evidence regarding her ailments, including the findings of Drs. Gharavi, Dilworth, Hulse, Tokaruk, Gore, and Donovan.  The ALJ, after evaluating all of the medical, vocational, and testimonial evidence, determined that Plaintiff  "does not have the gravity of symptoms nor medical documentation in order to establish an impairment of listing severity."  TR 20.  The rationale in the ALJ's decision, quoted in the statements of error above, specifically addresses the medical evidence, as well as Plaintiff's testimony and subjective claims regarding the severity of her symptoms, clearly indicating that these impairments were considered.  TR 20-26.  There is no evidence to support Plaintiff's claims that the ALJ did not consider her myriad of symptoms.

It is clear from the ALJ's detailed articulated rationale that he considered the record as a whole in evaluating the combined effect of Plaintiff's impairments and reached a reasoned decision that her impairments did not meet a listing level of severity.  Plaintiff's argument fails.

### IV.  RECOMMENDATION

For the reasons discussed above, the undersigned recommends that Plaintiff's Motion for Judgement on the Administrative Record be DENIED, and that the decision of the Commissioner be AFFIRMED.

Under Rule 72(b) of the Federal Rules of Civil Procedure, any party has fourteen (14) days after service of this Report and Recommendation in which to file any written objections to this Recommendation with the District Court. Any party opposing said objections shall have fourteen (14) days after service of any objections filed to this Report in which to file any response to said objections. Failure to file specific objections within fourteen (14) days of service of this Report and Recommendation can constitute a waiver of further appeal of this Recommendation. *See Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L. Ed. 2d 435 (1985), *reh'g denied*, 474 U.S. 1111 (1986); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72.

E. CLIFTON KNOWLES
United States Magistrate Judge